IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Scotty M. Horne,           ) | Civil Action No. 6:16-390-RBH-KFM |
|         ) | |
|        Plaintiff,    ) | **REPORT OF MAGISTRATE JUDGE** |
|         ) | |
|      vs.      ) | |
|         ) | |
| Nancy A. Berryhill, Acting   ) | |
| Commissioner of Social Security,   ) | |
|         ) | |
|        Defendant.   ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1] The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on March 21, 2012, alleging that he became unable to work on January 15, 2011. The application was denied initially and on reconsideration by the Social Security Administration. On August 14, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and William W. Stewart, Ph.D., an impartial vocational expert, appeared at a hearing on May 8, 2014, considered the case *de novo* and, on June 27, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on December 16, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

(2)  The claimant has not engaged in substantial gainful activity since January 15, 2011, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).

(3)  The claimant has the following severe impairments:  stable ascending aortic aneurism; chronic obstructive pulmonary disorder (COPD), complicated by tobacco abuse that is in early remission; depression; anxiety; and rule out personality disorder (20 C.F.R. § 404.1520(c)).

(4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)  After careful consideration of the entire record, I find that the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except he is limited to simple, routine tasks that do not require ongoing interaction with the general public or close "team type" interaction with co-workers, do not require reading or writing above a second grade level, and takes place in a low stress environment (defined as not required to make complex decisions at the workplace, not required to meet a rigid production schedule, or to adapt to frequent changes in the workplace) and the claimant is limited to non-confrontational supervisory interaction.  Additionally, the claimant is limited to no more than occasional stooping, crouching, kneeling, climbing of stairs and ramps, crawling, and balancing, and no climbing of ladders, ropes, or scaffolds.  The claimant should also have no concentrated exposure to dusts, fumes, gases, odors, or extremes of humidity, heat, or cold.

(6)  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on November 26, 1964, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)  The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2011, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged

3

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520(a)(4). If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.*

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

4

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Evidence Before the ALJ

The plaintiff was 46 years old on the alleged disability onset date (January 15, 2011) and 49 years old on the date of the ALJ's decision (June 27, 2014). He has past relevant work experience as a transmission mechanic (Tr. 34).

On April 10, 2011, the plaintiff was hospitalized for an evaluation of his aortic aneurysm. A CT angiogram showed an aortic aneurysm measuring 47 mm with no evidence of dissection (Tr. 267-81).

On July 11, 2011, George Butler, M.D., of Pageland Family Medicine evaluated the plaintiff for followup of chronic medical problems including anxiety and an aortic aneurysm. The plaintiff reported that he had been out of his medications for about a week because they were stolen. The plaintiff admitted to problems staying calm and reported problems with maintaining relationships and outbursts. Dr. Butler discussed medications with the plaintiff and diagnosed aortic aneurysm, currently asymptomatic; anxiety, insomnia, and gastroesophageal reflux disease ("GERD"). He restarted the plaintiff's medications including fenofibrate, omeprazole, Valium, and Celexa (Tr. 285-86).

On November 7, 2011, Kushal Kumar Handa, M.D., evaluated the plaintiff for followup of an aortic dilation. The plaintiff denied chest pain, dyspnea, or limitation of physical activity. Dr. Handa noted that the plaintiff did have a bad back. Dr. Handa reviewed the plaintiff's diagnostic testing from October (Tr. 651-52) and indicated that testing clearly showed a change in the degree of aortic regurgitation compared to his April studies, which had been graded to be moderate at that time. Dr. Handa's impression was "history of dilated ascending aorta, currently noted to be stable as well as questionable bicuspid aortic valve with significant improvement in terms of his aortic regurgitation." Dr. Handa recommended continued six-month monitoring and testing. He continued the plaintiff's current treatment regimen and recommended smoking cessation. Dr. Handa noted the plaintiff's report that he was a mechanic and that he was not able to go back to work because of his bad back and because his job required manual and physical labor (Tr. 314-15).

On November 21, 2011, Dr. Butler evaluated the plaintiff for multiple medical problems including left hip pain. Dr. Butler indicated that the plaintiff had recently called from his pharmacy demanding an ibuprofen refill, which Dr. Butler indicated was not a good idea because it might cause his aneurysm to bleed. Dr. Butler switched the plaintiff to Nucynta since the plaintiff's pain was mainly at bedtime. Dr. Butler also indicated that the plaintiff suffered from insomnia, depression, anxiety, and anger management. The plaintiff reported that Ambien was not effective and that he wanted something different for his nerves other than Valium. Dr. Butler suggested that the plaintiff should develop his coping skills by working with a psychiatrist, which the plaintiff was hesitant to do. Dr. Butler indicated that the plaintiff's blood pressure was controlled on his current blood pressure medications. Dr. Butler noted that the plaintiff was not working in his usual occupation because his cardiologist had asked him not to do any heavy lifting. Dr. Butler concluded that "unfortunately, his skill set could not permit him to perform clerical tasks" (Tr. 344-45).

On November 28, 2011, the plaintiff was evaluated in the emergency room through Daymark Recovery Services after displaying aggressive, violent behaviors. The plaintiff's spouse was concerned that his behavior may have been a reaction to Ativan that he was given at the hospital. She feared that the plaintiff would hurt himself or others. The plaintiff was disheveled, hostile, and agitated. His thought process was racing, and his speech was tangential. The plaintiff's mood was depressed, anxious, and irritable. It was noted that he had various stressors and recent life changes including medical issues, an inability to work, and problems with finances. The plaintiff's intelligence was estimated to be below average. He admitted to using cocaine over the weekend. The plaintiff reported that he was unable to read and was unable to lift over ten pounds. The plaintiff was diagnosed with adjustment disorder with mixed disturbance; nicotine dependence; cocaine abuse; chronic pain, heart aneurism, lung disease, GERD; and a Global Assessment of Functioning ("GAF") score of 58.[2] The plaintiff was discharged after agreeing to follow up for outpatient anger management and help with coping skills for life changes and pain management (Tr. 323-31, 347-55).

On February 21, 2012, Dr. Butler evaluated the plaintiff and noted that, despite the problems the plaintiff had in November, he was pleasantly surprised to find that the plaintiff seemed to "be in a very good place." The plaintiff reported that he had been taking steps to boost his immunity. He reported feeling like a higher dose of Celexa would be beneficial. The plaintiff indicated that he was still unable to work because of his

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

aneurysm, but he denied chest pain and reported that he had been compliant with his cardiology followup. Dr. Butler noted that the plaintiff also had chronic pain and that Celebrex seemed to work well. Dr. Butler noted that the plaintiff had not followed through with the psychiatric referral and indicated that he did not need to go because he was doing well. Dr. Butler continued the plaintiff's medications and ordered blood work (Tr. 512-14).

On May 7, 2012, Dr. Butler completed a mental impairment questionnaire at the Commissioner's request. Dr. Butler indicated that the plaintiff's mental conditions included depression and anger management issues that were being treated with Celexa and Valium. Dr. Butler noted that he had recommended mental health treatment for the plaintiff. Dr. Butler indicated that the plaintiff was appropriately oriented, had a distractible thought process, had suspicious thought content, had a depressed and angry mood and affect, had poor attention and concentration, and had a poor memory. Dr. Butler indicated that the plaintiff's work-related limitation in function was "serious." Dr. Butler stated that the plaintiff had "difficulty concentration" and that "It would be difficult for him to get and keep a job" (Tr. 537).

On May 22, 2012, Dr. Butler evaluated the plaintiff and reviewed his blood work. Dr. Butler noted that the plaintiff's judgment, recent and remote memories, mood, and affect were abnormal. Dr. Butler also noted heart palpations and abnormal musculoskeletal stability. Dr. Butler stated, "He has a thoracic aortic aneurysm and because of this can no longer perform his usual tasks and clearly needs to go on disability." Dr. Butler noted that the plaintiff's hypertension and GERD symptoms were controlled with his current medications. The plaintiff reported that although he did not feel it was helpful in the past, he was ready to restart a trial of Ambien for his insomnia. Dr. Butler refilled the plaintiff's medications and prescribed Ambien (Tr. 604-06).

On June 12, 2012, the plaintiff had followup cardiac testing to check the status of his aortic aneurysm (Tr. 595-600).

On June 26, 2012, Dr. Butler evaluated the plaintiff for follow up of his chronic conditions including anger problems. Dr. Butler noted that the plaintiff's judgment, mood, and affect were abnormal (Tr. 603). Also on June 26th, Heather Longin, M.D., another physician in Dr. Handa's office, evaluated the plaintiff and reviewed his recent cardiac studies. Dr. Longin indicated that testing showed preserved left ventricular systolic function and mild aortic insufficiency. The plaintiff complained of some fatigue due to metoprolol, and Dr. Longin switched him to Toprol-XL (Tr. 634-36).

On June 27, 2012, the plaintiff had an x-ray of his lumbar spine that showed moderate degenerative discopathy and facet arthropathy at L5-S1 (Tr. 615).

On August 22, 2012, the plaintiff saw Dr. Butler for an evaluation and indicated that he had been denied disability. Dr. Butler stated, "He is going to reapply, and I think eventually, he will be successful." Dr. Butler refilled the plaintiff's medication (Tr. 672-75).

On October 15, 2012, Dr. Butler evaluated the plaintiff for left arm and shoulder pain. Dr. Butler noted that the plaintiff was tender over the biceps tendon insertion. Dr. Butler noted that the plaintiff had tendinitis in the past and that this seemed like a recurrence. Dr. Butler gave the plaintiff a Kenalog injection (Tr. 669-71).

On November 8, 2012, Dr. Longin evaluated the plaintiff for followup. The plaintiff reported that had been feeling well and had no chest or upper back pain. Dr. Longin continued the plaintiff's current treatment regimen (Tr. 714-16).

On November 27, 2012, the plaintiff had a CT scan that showed no evidence of pulmonary embolus or thoracic aortic dissection. The plaintiff's ascending aorta remained dilated as it had previously (Tr. 667-78). Dr. Butler evaluated the plaintiff for followup of his chronic conditions and reviewed and refilled the plaintiff's medication (Tr. 665-68).

On December 3, 2012, Dr. Longin evaluated the plaintiff and reviewed his recent testing. The plaintiff did not report any symptoms related to his aortic aneurysm. Dr. Longin indicated that the plaintiff's diagnostic testing showed that his condition was stable. Dr. Longin advised restrictions with heavy lifting or weight lifting. She continued the plaintiff's current treatment regimen (Tr. 710-13).

On February 8, 2013, the plaintiff was treated at an urgent care center for knee pain. He was diagnosed with bursitis and was prescribed diclofenac and tramadol (Tr. 653-59).

On February 25, 2013, Dr. Handa evaluated the plaintiff for followup of his aortic aneurysm. The plaintiff reported doing well with the exception of increased dyspnea, which Dr. Handa indicated might be secondary to his pulmonary status. Dr. Handa ordered additional testing (Tr. 708-709).

On March 4, 2013, Dr. Butler evaluated the plaintiff for followup of his chronic conditions and medication refills. Dr. Butler noted that the plaintiff's insomnia was improved with Ambien, and his anxiety was responsive to Valium. Dr. Butler encouraged the plaintiff to quit smoking. Dr. Butler refilled the plaintiff's medications and ordered blood work (Tr. 661-64).

On March 7, 2013, Dr. Handa evaluated the plaintiff and noted that his aortic valve pathology with concurrent ascending thoracic aortic aneurysm was deemed to be stable (Tr. 705-707).

On March 25, 2013, Grigor Badalyan, M.D., evaluated the plaintiff for followup of chronic obstructive pulmonary disease. Dr. Badalyan reviewed the plaintiff's history and diagnosed chronic obstructive pulmonary disease, moderate in severity; ongoing tobacco abuse; and bicuspid aortic valve and aortic aneurysm per cardiology (Tr. 681-85).

On September 4, 2013, Dr. Butler evaluated the plaintiff for followup of multiple medical problems, including anxiety and insomnia. Dr. Butler stated, "Because of

his known aneurysm he is to avoid heavy lifting and since he lacks the skills to perform clerical duties, he is unemployed and is essentially unemployable. He should go on disability." The plaintiff reported that his insurance would no longer cover Valium, and they decided that he would continue on that medication and pay for it out of pocket (Tr. 729-33).

On September 10, 2013, Dr. Handa evaluated the plaintiff and noted that he continued to smoke. Dr. Handa reviewed the plaintiff's recent blood work. Dr. Handa indicated that the plaintiff's ascending aortic aneurysm was deemed stable. Dr. Handa continued the plaintiff's current treatment regimen (Tr. 740-41).

On January 10, 2014, Dr. Butler evaluated the plaintiff for followup of his multiple medical conditions. Dr. Butler refilled the plaintiff's medications and encouraged smoking cessation (Tr. 748-52).

On April 14, 2014, Dr. Butler evaluated the plaintiff. Dr. Butler indicated that the plaintiff's vitamin D level was low. Dr. Butler refilled the plaintiff's medications and ordered repeat blood work (Tr. 753-57).

At the administrative hearing, the plaintiff testified that he completed the ninth grade. He was promoted to the tenth grade, but he had "no desire" to continue because "didn't understand it." He testified that he could not read a newspaper and could not write a check (Tr. 49-51).

The plaintiff worked as a technician at a transmission shop from 1988 through 2011 (Tr. 56, 215). At this job, he reported that he used machines, tools, or equipment; used technical knowledge or skills; and wrote, completed reports, or performed similar duties. He was a "lead worker" (Tr. 216). The vocational expert testified that his work constituted skilled work (Tr. 76-77). After he stopped working, the plaintiff collected unemployment benefits in 2011, 2012, and 2013 (Tr. 59-60, 200-02, 207-09).

At the administrative hearing, the vocational expert testified that a hypothetical person with the plaintiff's RFC could perform light, unskilled jobs such as packing machine

tender and assembler (Tr. 79-80). The ALJ asked about the effect of "no reading or writing above . . . second grade level, functionally illiterate," and the vocational expert indicated that it would not change his answers (Tr. 82).

### *Evidence Submitted to Appeals Council*

On May 8, 2015, James W. Roberts, M.D., completed a questionnaire regarding the plaintiff indicating that on an eight-hour day, five day a week basis, the plaintiff could not engage in anything more than light or sedentary work. Dr. Roberts indicated that the diagnosis underlying this limitation was thoracic aortic aneurysm based on a CT scan. Dr. Roberts stated that, based on the plaintiff's records, these limitations began on "3/22/10 – Dr. Handa with Sanger Clinic took him out of work then." Dr. Roberts also stated that the latest date he was sure that the plaintiff was disabled was May 8, 2015 (Tr. 758).

On September 28, 2015, fifteen months after the ALJ's decision, counsel referred the plaintiff to Caleb Loring, Psy.D., for a reading assessment. The plaintiff reported to Dr. Loring that he went to school until the ninth grade, but he dropped out because he "did not care about school." He had 53 absences in the fifth grade and 67 absences in the seventh grade (Tr. 760). Dr. Loring stated that the plaintiff's records showed that "his grades looked fairly good his 9th grade year," but according to Dr. Loring, "this performance is quite inconsistent with the majority of his history" (Tr. 760; *see* Tr. 727 (showing that the plaintiff received grades in the ninth grade of 90 in English, 95 in Math, 92 in Social Studies, and 70 in Power Mechanics)). The plaintiff told Dr. Loring that "[h]e believes he was enrolled in special education classes" (Tr. 760). Dr. Loring stated that the plaintiff "has never held down a job where literacy skills would be required to successfully complete vocational duties" (Tr. 760).

Dr. Loring administrated a reading test, which showed low scores equivalent to a kindergartner, but he could read "very simple words" (Tr. 760-61). Dr. Loring stated

that this was consistent with the plaintiff's purported inability to fill out office paperwork and was "consistent with the majority of his educational history" (Tr. 761). Dr. Loring concluded that the plaintiff "presented as someone who is functionally illiterate," and he "would be able to read only perhaps the simplest low-literacy materials designed for adults" (Tr. 761).

On October 7, 2015, Dr. Loring completed a questionnaire regarding the plaintiff, stating that the plaintiff was illiterate under the following definition:

> Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

Dr. Loring also indicated that the plaintiff's test results had been generally consistent with the his school records. Dr. Loring explained, "For some reason it looks like he got some decent grades in the 9th grade, but this is inconsistent with all of his other educational history, presentation, and vocational history" (Tr. 762).

The Appeals Council specifically considered and made the foregoing evidence a part of the record (Tr. 5), but found that the evidence did not provide a bases for changing the ALJ's decision (Tr. 2).

## ANALYSIS

The plaintiff argues that the ALJ erred by failing to follow the Medical-Vocational Guidelines ("Grids") (doc. 17 at 16-20). The plaintiff further argues that the case should be remanded for consideration of evidence submitted to the Appeals Council (*id.* at 20-23).

## 1. Step Five

When an ALJ finds that a claimant cannot return to past work, the burden of production shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in the national economy. 20 C.F.R. § 404.1520(g); *Hunter v. Sullivan*,

993 F.2d 31, 35 (E.D. Va. 2011). To meet this burden, the Commissioner may in appropriate circumstances rely on the Medical-Vocational Guidelines ("Grids"), which take administrative notice of available jobs in the national economy. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b). Reliance on the Grids is appropriate where the claimant suffers primarily from exertional impairments without significant nonexertional factors; however, when a claimant suffers from both exertional and nonexertional impairments, the Grids are not conclusive and may only serve as guidelines, unless there is a rule that directs a conclusion of "disabled" based on the strength limitations alone without considering the additional effects of a nonexertional impairment. *Id.* § 200.00(e); 20 C.F.R. § 404.1569a(d); SSR 83-14, 1983 WL 31254, at *3.

Here, the ALJ found at step four of the sequential evaluation process that the plaintiff's RFC precluded him from performing his past medium, skilled work as a transmission mechanic (Tr. 34). The ALJ noted that, on the alleged disability onset date, the plaintiff was 46 years old, which is defined as a younger individual age 18-49 (Tr. 34). *See* 20 C.F.R. § 404.1563. The ALJ stated that transferability of job skills was not material to the determination of disability because using the Grids as a framework supported a finding that the plaintiff was not disabled whether or not the plaintiff had transferable job skills (Tr. 34). At step five, the ALJ found that if the plaintiff had the RFC to perform a full range of light work, a finding of "not disabled" would be directed by Rule 202.18. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.18.[3] Because the plaintiff's ability to perform the requirements of light work was impeded by additional limitations, the ALJ used a vocational expert to determine the extent to which the limitations eroded the unskilled light occupational base (Tr. 34). The vocational expert testified that the hypothetical individual described by the ALJ

_____

[3]Rule 202.18 states that a younger individual with limited or less education and skilled or semi-skilled past work with no transferable skills is "not disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.18.

could perform occupations such as packing machine tender and assembler (Tr. 79-80) in numbers that the ALJ found was sufficient (Tr. 35). Thus, the ALJ concluded the plaintiff was not disabled from January 5, 2011, the alleged onset date, through June 27, 2014, the date of the ALJ's decision (Tr. 35).

The plaintiff argues that the ALJ should have relied on Rule 202.09 to direct a conclusion of "disabled," rather than using Rule 202.18 as a framework and obtaining vocational expert testimony.

### a. Borderline Age

The plaintiff first argues that the ALJ erred in failing to consider his borderline age at the fifth step of the sequential evaluation process (doc. 17 at 16-20). "The claimant's age at the time of the ALJ's decision governs in applying the [G]rids. " *Bush v. Astrue*, C.A. No. 5:06-00766, 2008 WL 867941, at *5 (S.D.W. Va. Mar. 28, 2008) (citing *Varley v. Sec. of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir.1987)). When a borderline age situation exists, the regulations provide:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). In *Bush v. Astrue*, the United States District Court for the Southern District of West Virginia found, "Generally, it appears that Claimants are in a borderline situation when they are about six months from an older age category." 2008 WL 867941, at *5 (collecting cases) (citations omitted). At the time of the ALJ's decision in this case, the Social Security Administration's *Hearings, Appeal and Litigation Law Manual* ("HALLEX") provided the following test for determining whether a borderline situation exists:

> To identify borderline age situations when making disability determinations, adjudicators will apply a two-part test:

15

(1)  Determine whether the claimant's age is within a few days or a few months of a higher age category.

(2)  If so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled."

If the answer to one or both is "no," a borderline age situation either does not exist or would not affect the outcome.  The adjudicator will then use the claimant's chronological age.

If the answer to both is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age. (Use of the higher age category is not automatic.) To decide which age category to use, take a "sliding scale" approach. Under this approach, the claimant must show progressively more additional vocational adversity(ies)-to support use of the higher age-as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens.

One finds additional vocational adversity(ies) if some adjudicative factor(s) is relatively more adverse when considered in terms of that factor's stated criteria, or when there is an additional element(s) which has adverse vocational implications. Examples of these additional vocational adversities are the presence of an additional impairment(s) which infringes upon-without substantially narrowing-a claimant's remaining occupational base; or the claimant may be barely literate in English, have only marginal ability to communicate in English, or have a history of work experience in an unskilled job(s) in one isolated industry or work setting. (An isolated industry would be such as fishing or forestry.).  Other adverse circumstances in individual cases may justify using the higher age category.

Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age-even when the time period is only a few days. The adjudicator need not explain his or her use of the claimant's chronological age.

Consider applying these guidelines whenever the age category changes within a few months after the alleged onset date, the date last insured (or the prescribed period), or the date of the ALJ's decision. . . .

HALLEX II-5-3-2.[4]

The plaintiff was born on November 26, 1964 (Tr. 48), and, therefore, the plaintiff turned 50 years old five months after the ALJ issued his decision. Clearly a borderline age situation exists in this case. The matter is significant because Rule 202.09 directs a finding of "disabled" for an individual who is closely approaching advanced age (age 50-54), 20 C.F.R. § 404.1563(d), who is also illiterate, has unskilled or no past work experience, and is limited to light work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09.

### b. Education/Literacy

The Commissioner argues that Rule 202.09 does not apply for several reasons (doc. 18 at 6-13). First, the Commissioner argues that the plaintiff is not illiterate and thus does not meet the education category for Rule 202.09. The ALJ found that the plaintiff had a "limited education" (Tr. 34), which is defined in the regulations as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. § 404.1564(b)(3). The plaintiff testified that he could not read a newspaper or a letter and could not write a check (Tr. 50-51). The ALJ stated that the plaintiff's claim that he could not read was "suspect . . . since he was promoted to the tenth grade before he quit school" and because he worked as a mechanic for many years (Tr. 31). The regulations recognize that the grade completed in school may not represent a claimant's actual educational abilities and therefore will be used to

---

[4] On March 25, 2016, HALLEX II-5-3-2 was removed because the Administration incorporated instructions for handling borderline age issues in the new HALLEX I-2-2-42 and I-3-3-25. HALLEX Transmittal No. II-5-11, available at https://www.ssa.gov/OP_Home/ hallex/TS/tsii-5-11.html. Upon remand, HALLEX I-2-2-42 would be appropriate for consideration by the ALJ. The new instructions provide that when a borderline age situation exists an ALJ will address the issue in the decision, regardless of which age category the ALJ decides to apply. HALLEX 1-2-2-42, available at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-2-42.html.

determine educational ability only "if there is no other evidence to contradict it." 20 C.F.R. § 404.1564(b). Further, courts have found error where an ALJ relied solely on an inference from a claimant's previous skilled employment to support the conclusion that a claimant was literate. *See Eggleston v. Bowen*, 851 F.2d 1244, 1248 (10th Cir. 1988). *See also Albritton v. Sullivan*, 889 F.2d 640, 642-43 (5th Cir. 1989) (finding substantial evidence did not support ALJ's determination that claimant, who had past relevant work experience as an auto mechanic, was literate).

The ALJ acknowledged that the plaintiff was in special education classes (Tr. 31), and, despite his statement that the plaintiff's claim he could not read was "suspect," the ALJ limited the plaintiff's RFC to "not require reading or writing above a second grade level" (Tr. 27). *See Jackson v. Astrue*, C.A. No. 8:08-2855-JFA-BHH, 2010 WL 500449, at *8 (D.S.C. Feb. 5, 2010) (noting that claimant with third grade reading level was "functionally illiterate"). The Commissioner argues that the ALJ was simply giving the plaintiff "the benefit of the doubt in limiting [him] to reading and writing at the second grade level in his RFC finding" (doc. 18 at 7). However, the fact remains that the ALJ did so limit the plaintiff in the RFC finding. The regulations state that a claimant is considered illiterate if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 404.1564(b). In addition to the plaintiff's testimony, in evidence submitted to the Appeals Council, a reading evaluation by Dr. Loring revealed the plaintiff had scores equivalent to a kindergartner, and Dr. Loring opined that the plaintiff was functionally illiterate under the definition provided in the regulations (Tr. 760-62).

Given the apparent inconsistency between the ALJ's finding that the plaintiff met the "limited education" category while also finding that he was limited to reading and writing on a second grade level, the undersigned finds that remand for further consideration of this issue is required.

### c. Past Work Experience

As set forth above, Rule 202.09 directs a finding of "disabled" for an individual who is closely approaching advanced age, who is also illiterate, has unskilled or no past work experience, and is limited to light work.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09. The Commissioner next argues that Rule 202.09 is inapplicable because the plaintiff's past work as a transmission mechanic was skilled work (doc. 18 at 10-12). While the ALJ found that the plaintiff's past relevant work as a transmission mechanic was skilled work (Tr. 34), the ALJ did not make any findings concerning the transferability of the plaintiff's job skills. Rather, the ALJ found that the transferability of job skills was not material to the determination of disability "because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills" (Tr. 34).  If the plaintiff can establish that he is illiterate and the higher age category is appropriate, the transferability of the plaintiff's job skills becomes relevant for purposes of establishing disability under Rule 202.09.

The plaintiff agues that past skilled or semi-skilled work where the skills are not transferable is the same as unskilled previous work (doc. 17 at 19) (citing *Silveira v. Apfel*, 204, F.3d 1257, 1258 (9th Cir. 2000).  The regulations specifically provide that "[i]f you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled." 20 C.F.R. § 404.1565(a).  *See also* SSR 82-41, 1982 WL 31389, at *2 ("The table rules in Appendix 2 are consistent with the provisions regarding skills because the same conclusion is directed for individuals with an unskilled work background and for those with a skilled or semiskilled work background whose skills are not transferable.").  In *Glenn v. Colvin*, United States District Judge R. Bryan Harwell, the presiding judge in the instant case, considered this same issue and concluded "that skilled or semi-skilled work history with no transferable skills is equivalent to an unskilled work history under the applicable Social Security regulations and rulings."    C.A. No.

2:14-cv-1116-RBH, 2015 WL 4878792, at *6 (D.S.C. Aug. 14, 2015) (remanding for determination of whether claimant was illiterate, whether his job skills were non-transferrable, and whether he was disabled under Rule 202.09).

Social Security Ruling 82-41 provides that, "[w]hen the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision.  Findings should be supported with appropriate documentation." SSR 82-41, 1982 WL 31389, at *7.  As the ALJ did not consider this issue, he should be directed to do so on remand.

Based upon the foregoing, the case should be remanded for the ALJ to:  1) consider the plaintiff's borderline age; 2)  consider and determine whether the plaintiff is illiterate; 3)  determine whether the plaintiff's job skills are transferable or non-transferable with the understanding that skilled or semi-skilled work history with no transferable skills is equivalent to an unskilled work history under the Grids; and 4)  determine whether the plaintiff is disabled under Rule 202.09. *See Hackney v. Colvin*, C.A. No. 2:16-04882,  2016 WL 8730160, at *8 (S.D. W.Va. Dec. 23, 2016) (recommending remand for consideration of whether claimant was illiterate, whether his job skills were transferable, and whether he was disabled under Rule 202.09) (citing *Glenn*, 2015 WL 4878792, at *7), *R&R adopted by* 2017 WL 1370740 (S.D. W. Va. April 7, 2017).

## 2.  Appeals Council Evidence

The plaintiff further argues that new evidence submitted to the Appeals Council might have affected the fact-finder's decision, and remand is therefore required pursuant to *Meyer v. Astrue*, 663 F.3d 700 (4th Cir. 2011) (doc. 17 at 20-23).  In *Meyer*, the court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard. *Id*. at 704.  "In making this determination, we 'review the record as a whole' including any new evidence that the

Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

As indicated above, the plaintiff submitted to the Appeals Council evidence that included a reading evaluation by Dr. Loring that revealed the plaintiff had scores equivalent to a kindergartner, and Dr. Loring's opinion that the plaintiff was functionally illiterate under the definition provided in the regulations (Tr. 760-62). This evidence was specifically incorporated into the administrative record by the Appeals Council (Tr. 5). Accordingly, upon remand, the ALJ should consider this evidence and explain the weight given to it in his consideration of the issues discussed herein.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

April 24, 2017
Greenville, South Carolina